Received From
SEATTLE

JUL 13 2007

_____ FILED      _____ ENTERED
_____ LODGED     _____ RECEIVED

JUL 1 1 2007      LK

AT SEATTLE
The Honorable U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9  JERRE DANIELS-HALL and DAVID
   HAMBLEN, individually and on behalf of all
10 others similarly situated,

                              Plaintiffs,

11

12      v.

13 NATIONAL EDUCATION ASSOCIATION, a
   Washington, D.C. corporation, NEA MEMBER
   BENEFITS CORPORATION, a Delaware
14 corporation, NATIONWIDE LIFE
   INSURANCE COMPANY, an Ohio corporation,
15 SECURITY BENEFIT CORP., a Kansas
   intermediate stock holding company,
16 SECURITY BENEFIT LIFE INSURANCE
   COMPANY, a Kansas stock life insurance
17 company, SECURITY BENEFIT GROUP, INC.,
   a Kansas holding company and management and
18 financial services company, SECURITY
   DISTRIBUTORS, INC., a Kansas corporation,
19 DENNIS BERNIE VAN ROEKEL, Director of
   NEA Member Benefits Corporation, WILLIAM
20 BJORK, Director of NEA Member Benefits
   Corporation, AL MANCE, Director of NEA
21 Member Benefits Corporation, SHERIDAN
   PEARCE, Director of NEA Member Benefits
22 Corporation, TERRI SANDERS, Director of
   NEA Member Benefits Corporation, SUSAN
23 KUZIAK, Director of NEA Member Benefits
   Corporation, SARAH BORGMAN, Director of
24 NEA Member Benefits Corporation, LILY
   ESKELSEN, Chairman of the Board of Directors
25 of NEA Member Benefits Corporation, JOHN
   and JANE DOE DEFENDANTS 1–99, former
26 and current Directors of NEA Member Benefits
   Corporation.
                              Defendants.

No. **C 07-5339** JKA

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY
ACT (ERISA)

07-CV-05339-CMP

SEA/10669  Summ. Issu.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA
(Cause No. _____)                          Page - 1

## I. INTRODUCTION

1.     This is a class action brought by Plaintiffs Jerre Daniels-Hall and David Hamblen, on behalf of themselve s and other participants and beneficiari es of the National Education Association ("NEA") Valuebuilder Plan (hereinafter the "Plan"), an Internal Revenue Code ("I.R.C.") section 403(b), 26 U.S.C. § 403(b), tax deferred annuity program established and maintained by Defendants NEA and NEA Member Benefits Corporation ("NEAMBC"), a subsidiary of Defendant NEA.  The annuities and mutual funds offered under the Plan were issued by Defendant Nationwide Life Insurance Company ("Nationwide"), and Defendants Security Distributors, Inc. ("SDI"), a wholly owned subsidiary of Defendant Security Benefit Group, Inc. ("SBG"), a wholly owned subsidiary of Security Benefit Life Insurance Company ("SBLIC"), (hereinafter the Security Benefit Defendants are collectively referred to as "Security Benefit" unless stated otherwise).  This case is brought pursuant to sections 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) & (a)(3), against the fiduciaries of the Plan for violations of ERISA.

2.     From at least 1991 through the present, NEA, by and through NEAMBC, exclusively endorsed the Plan.  Plaintiffs, together with at least 57,000 other NEA Members, enrolled in the Plan.  Upon information and belief, NEA Members have invested over $1 billion in the Plan.

3.     The Plan is purported to be a section 403(b) retirement plan.  Section 403(b) of the I.R.C. ("section 403(b)" or "403(b)") provides for a tax-deferred retirement savings program for employees of educational institutions and certain non-profit organizations.[1]  Under section 403(b), individuals can save for retirement by establishing annuity accounts and designating that portions of their salaries be deferred to and invested therein.

---

[1] Participants can include teachers, school administrators, school personnel, nurses, doctors, professors, researchers, librarians, and ministers.

4.      As with any retirement plan, a section 403(b) plan is considered an "employee pension benefit plan" as that term is defined by ERISA, and, thus, subject to ERISA, if it is established or maintained by an employer or employee organization.   ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

5.      NEA and NEAMBC are employee organizations, as that term is defined by ERISA, that established and maintained the Plan. They did so through their substantial and far-reaching involvement in the set-up, management, administration, marketing, promotion and endorsement of the Plan.

6.      Specifically, NEA and NEAMBC selected Nationwide, and then Security Benefit as the " exclusively end orsed" 403(b) p rovider.   NEA and NEAMBC wor ked directl y with Nationwide and then Security Benefit to design the Plan and determine the investments and benefits offered by the Plan, monitored such investments and benefits, communicated extensively with Plan participants regarding the Plan and Plan assets and vigorously promoted the Plan.[2]

7.      As a result of NEA's and NEAMBC's substantial and meaningful involvement in the management, administration, and operation of the Plan, and NEAMBC's receipt of millions of dollars of compensation for such involvement, the Plan constitutes an "employee benefit plan" under ERISA. Accordingly, ERISA's stringent fiduciary duties and prohibitions against self-dealing apply to the Plan and its fiduciaries. NEA and NEAMBC, together with the defendant insurance companies, breached these duties in a variety of respects.

8.      NEA and NEAMBC selected Security Benefit and Nationwide to be the "exclusively endorsed" providers of their 403(b) program for NEA members because Nationwide and Security Benefit paid NEAMBC millions of dollars annually in endorsement fees.   These endorsement arrangements served the financial interests of NEA, NEAMBC,

---

[2] NEA and NEAMBC also selected Nationwide and then Security Benefit as the exclusively endorsed providers for the Plan. Once discovery is obtained, to the extent necessary and appropriate, Plaintiffs may seek leave to amend the complaint to add allegations against Defendants with respect to the NEA's 457 plan.

1    Nationwide, and Security Benefit, but did so to the direct and substantial detriment of Plan

2    participants.   The Plan fees and expenses charged by Nationwide and Security Benefit far

3    exceeded those of comparable and better performing products that were readily available in the

4    marketplace.   Prudent and loyal fiduciaries, as opposed to conflicted and self-serving ones,

5    would not have endorsed the Plan, nor encouraged participants to invest their hard-earned

6    retirement savings in the Plan. Indeed, the Plan is widely regarded as one of the most expensive

7    and worst performing retirement products offered to teachers and other school employees in the

8    United States.

9        9.      Defendants' elaborate endorsement arrangement used for their own advantage the

10   trust and confidence reposed in NEA by NEA members. By exclusively endorsing the Plan, and

11   touting this endorsement in marketing materials, NEA sought to create the impression that the

12   Plan was selected by NEA and NEAMBC because it was in the best interests of NEA members.

13   However, contrary to statements in NEA's marketing materials, NEA did not select the Plan

14   based on a prudent evaluation of the merits of the Plan.  Rather, NEA chose Nationwide and

15   Security Benefit as the exclusively endorsed 403(b) providers because of the millions of dollars

16   of endorsement fees paid by them to NEAMBC.

17       10.     Plaintiffs are NEA members who participate in the Plan.

18       11.     Defendants are: (a) NEA; (b) NEAMBC, which was established in 1967 by NEA

19   for the purpose of endorsing and monitoring "competitive" benefit programs, including insurance

20   plans, and investments for NEA members; (c) the Directors of NEAMBC ("Individual

21   NEAMBC Defendants"); (d) Nationwide; and (e) Security Benefit (collectively "Defendants").

22   Through the actions described herein, Defendants functioned as ERISA fiduciaries with respect

23   to the conduct at issue in this lawsuit.

24       12.     Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the

25   Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise

26   the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets as

1    required by ERISA § 404(a), 29 U.S.C. § 1104(a), during the Class Period (defined *infra*).

2    Plaintiffs also allege Defendants engaged in self-dealing that constituted prohibited transactions

3    under ERISA § 406, 29 U.S.C. § 1106.

4        13.    Specifically, Plaintiffs allege in Count I that Defendants breached their fiduciary

5    duties to the Plan participants under ERISA § 404(a), 29 U.S.C. § 1104(a); by failing to conduct

6    an adequate investigation of the merits of the Plan; by exclusively endorsing the Plan in

7    exchange for the payment of millions of dollars by defendant insurance companies

8    notwithstanding the fact that the Plan was substantially more expensive than comparable plans

9    that were readily available in the marketplace; and by failing to provide complete and accurate

10   information to participants regarding the Plan, the reasons for their endorsement, and the fact that

11   it was not in the best interests of NEA members. The excessive costs of the Plan as compared

12   with available lower cost equivalents resulted in tens of millions of dollars of lost retirement

13   savings for NEA members.

14       14.    Plaintiffs allege in Count II that Defendants breached their fiduciary duties under

15   ERISA § 404(a), 29 U.S.C. § 1104(a), by charging excessive and unreasonable fees that

16   materially reduced Plan participants' account balances; by failing to provide complete and

17   accurate information regarding Plan fees and expenses, and by engaging in self-dealing through

18   revenue sharing arrangements with mutual funds, mutual fund advisors and other investment

19   advisors (hereinafter collectively referred to as "Investment Entities") whose funds were offered

20   to Plan participants by Security Benefit and Nationwide. Investment Entities paid Nationwide

21   and Security Benefit to have their funds appear in the menu of options offered to Plan

22   participants. These payments created impermissible conflicts of interest. Despite their fiduciary

23   duties to Plan participants, Nationwide and Security Benefit selected funds based on the

24   payments they would receive rather than on an objective and prudent evaluation of the merits of

25   the funds and the best interests of Plan participants.  Nationwide's and Security Benefit's

26

1    selection of high-cost funds instead of widely known and available lower cost, high-quality

2    alternatives substantially diminished Plan participants' retirement savings.

3        15.    Plaintiffs allege in Count III that Defendants engaged in prohibited transactions

4    under ERISA § 406, 29 U.S.C. § 1106, through their revenue-sharing arrangements with

5    Investment Entities. ERISA prohibits the transfer of plan assets to, or the use of plan assets by,

6    or for the benefit of, parties in interest. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1). By

7    engaging in revenue sharing arrangements with Investment Entities through which Plan assets

8    were used directly and indirectly by Nationwide and Security Benefit for their own benefit,

9    Defendants violated ERISA § 406, 29 U.S.C. § 1106, and related provisions of ERISA.

10       16.    In Count I V, Plaintiffs alleg e Defendants breached their fiduciar y duties and

11   responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties

12   of prudent and loyal management and to provide complete and accurate communications.

13       17.    This action is brought on behalf of the Plan and seeks losses to the Plan and to its

14   participants for which Defendants are personally liable pursuant to ERISA §§ 409 & 502(a)(2),

15   29 U.S.C. §§ 1109 & 1132(a)(2). In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3),

16   Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive

17   relief and, as available under applicable law, a constructive trust, restitution, and equitable

18   tracing.

19       18.    As a matter of substantive law, ERISA §§ 409(a) & 502(a)(2), 29 U.S.C.

20   §§ 1109(a) & 1132(a)(2), authorize participants such as Plaintiffs to sue in a representative

21   capacity for losses suffered by the Plan as a result of breaches of fiduciary duty. An appropriate

22   procedural vehicle to assert such claims is a class action pursuant to Rule 23 of the Federal Rules

23   of Civil Procedure ("Fed. R. Civ. P."), and Plaintiffs bring this action as a class action on behalf

24   of all participants and beneficiaries of the Plan during the Class Period.

25

26

## II. JURISDICTION AND VENUE

19.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

20.     **Personal Jurisdiction.** ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them.

21.     **Venue.** Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1391(b) because the breaches took place in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III. PARTIES

**A.     Plaintiffs:**

22.     **Plaintiff Jerre Daniels-Hall.** Ms. Daniels-Hall is a resident of Port Orchard, Washington. Plaintiff Daniels-Hall has been a member of NEA since July 1995. Throughout the Class Period, she has been employed by the South Kitsap School District. Plaintiff Daniels-Hall began participating in the Plan in 1995 and has deposited over $12,000 into the Plan since that time. Plaintiff Daniels-Hall still has her retirement funds invested in the Plan.

23.     **Plaintiff David Hamblen.** Mr. Hamblen is a resident of Diamond Springs, California. Plaintiff Hamblen has been a member of NEA for at least 25 years. Throughout the Class Period, he has been employed by the El Dorado Union High School District. Plaintiff Hamblen began participating in the Plan over five years ago and has over $30,000 invested in the Plan. Plaintiff Hamblen still has his retirement funds invested in the Plan.

**B.     Defendants:**

24.     **Defendant National Education Association.** NEA is the nation's largest professional employee organization. According to the NEA Member Benefits Resource Guide, http://www.neamb.com/NEAMB_ResourceGuide.pdf ("NEAMB Guide"), the NEA has

3.2 million members include elementary and secondary teachers, higher education faculty, education support professionals, school administrators, retired educators, and college students preparing to teach. Founded in 1857, NEA's stated mission is "to improve the quality of public education and the professional status of those who dedicate their lives to it." NEA established a member benefits subsidiary corporation for NEA members in 1967, which was formerly known as Teachers Services Corporation. NEA Teachers Services Corporation merged into a new company to form NEAMBC in 1985. NEA owns and governs NEAMBC, which in turn is substantially involved in the operation, administration, sponsorship, and management of the Plan.

25.    **Defendant NEA Member Benefits Corporation**. NEAMBC is a wholly-owned subsidiary of NEA. NEAMBC is governed by a Board of Directors appointed by NEA, with the NEA Secretary-Treasurer serving as the Chairperson. NEAMBC's Board is comprised of three NEA officers, two NEA state affiliate executive staff members, two members of the NEA Board of Directors, and one NEA state affiliate President. NEAMBC is operated and controlled by NEA. NEAMB Guide, at i. NEAMBC offers many benefit programs to NEA members. One of NEAMBC's functions is that it endorses, sponsors, administers and monitors insurance plans, investments, and benefit programs for NEA members. NEAMBC's stated mission is to

> help make members' lives better by leveraging the Association's group purchasing power to provide members with high quality investment, insurance, credit, discount products and consumer services. These member-only programs offer prospective members an additional reason to join the Association and current members an incentive to retain their Association membership.

About NEA Member Benefits, http://www.neamb.com/about/index.jsp (June 25, 2007).

As set forth in more detail below, NEAMBC, through its substantial involvement in the operation, administration, and management of the Plan, established and maintained the Plan as those terms are defined by ERISA.

26. **Individual NEAMBC Defendants**. On information and belief, NEAMBC is managed by its Board of Directors. Upon information and belief, the members of the Board of Directors during the Class Period included:

(i) Dennis Bernie Van Roekel, Director of NEAMBC;

(ii) William Bjork, Director of NEAMBC;

(iii) Al Mance, Director of NEAMBC;

(iv) Sheridan Pearce, Director of NEAMBC;

(v) Terri Sanders, Director of NEAMBC;

(vi) Susan Kuziak, Director of NEAMBC;

(vii) Sarah Borgman, Director of NEAMBC; and

(viii) Lily Eskelsen, Chairman of the Board of Directors of NEAMBC.

27. **John and Jane Doe Defendants 1–99.** Fictitious John and Jane Doe Defendants 1–99 are current or former Directors of NEAMBC during the Class Period whose identities are not now known to Plaintiffs. Once their identities are discovered, Plaintiffs will seek leave to amend to join them under their true names.

28. **Defendant Nationwide Life Insurance Company.** Nationwide is a stock life insurance company organized under the laws of the state of Ohio and is registered to do business in the state of Washington. Nationwide is a provider of life insurance, annuity contracts and retirement products. From 1991 to 2000, Nationwide was the exclusively endorsed NEA Plan provider. Nationwide provided its contracts to NEA members through SDI. According to newspaper articles and a Nationwide press release, in September 2000 Nationwide sold its block of NEA Valuebuilder business, including 57,000 contracts and more than $860 million in assets, to Security Benefit Life Insurance Company for about $72 million. Upon information and belief, Nationwide still provides annuity contracts under the Plan as evidenced by its May 1, 2007, prospectuses.

1    29.    **Defendant Security Distributors, Inc.**  SDI, a Kansas corporation, is a wholly

2    owned subsidiary of SBG.  SDI is the principal underwriter for annuity contracts offered by

3    Security Benefit to NEA members through the NEAMBC.  SDI is also the general distributor for

4    contracts offered and underwritten by SBLIC and by Nationwide through the NEAMBC to NEA

5    members.  SDI is registered as a broker/dealer with the Securities and Exchange Commission

6    under the Securities Exchange Act of 1934, as amended.

7    30.    **Defendant Security Benefit Group, Inc.**  SBG a wholly owned subsidiary of

8    SBLIC.  SBG is a holding company and management and financial services company domiciled

9    in Kansas.

10   31.    **Defendant Security Benefit Life Insurance Company.**  SBLIC is a stock life

11   insurance corporation organized under the laws of the state of Kansas and is registered to do

12   business in the state of Washington.  It was organized originally as a fraternal benefit society and

13   commenced business in 1892.

14   32.    Security Benefit is engaged in the business of offering life insurance policies,

15   annuity contracts, and retirement services to persons in, but not limited to, Washington state.

16   Upon information and belief and according to newspaper articles and a Nationwide press release,

17   on or about September 21, 2000, Security Benefit reached an agreement with Nationwide in

18   which Security Benefit purchased Nationwide's block of NEA Valuebuilder contracts and

19   assumed all risk, liability, profits, assets and service requirements for such contracts from

20   Nationwide.[3]  Thus, in addition to being liable for its own actions as administrator of the Plan,

21   Security Benefit is liable for Nationwide's actions as the predecessor administrator of the Plan

22   under a theory of successor liability.  Upon information and belief, because Nationwide still

23   currently participates in the NEA Valuebuilder business by providing annuity contracts which

24

25   _____

26   [3] It is noted that Nationwide has issued prospectuses as late as May 1, 2007, for the NEA Valuebuilder product, and
     thus, upon information and belief, Nationwide continues to participate in the endorsement and revenue sharing
     arrangements at issue in this Complaint.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA
(Cause No. _____)                          Page - 10

are distributed by SDI, it is additionally concurrently and independently liable for the allegations set forth in this Complaint.

## IV. THE PLAN

### A.    Nature of the Plan

**1.    NEA and NEAMBC Established and Maintained a Plan as a Result of their Extensive Involvement in the Operation, Management and Administration of the 403(b) Program**

33.    With limited exceptions not applicable here, ERISA applies to "any employee benefit plan if it is established or maintained (1) by any employer engaged in commerce or in any industry or activity affecting commerce; or (2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or (3) by both." ERISA § 4(a), 29 U.S.C. § 1003(a).

34.    Pursuant to ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), the terms "employee pension benefit plan" and "pension plan" mean:

> . . . any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program -
>
> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

35.    The term "employee organization" means "any labor union or any organization of any kind, or any agency or employee representation committee, association, group, or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships; or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan." ERISA § 3(4), 29 U.S.C. §1002(4).

1    36.    Here, the Plan provides retirement income to employees and results in a deferral

2    of income by employees for a period extending to the termination of covered employment or

3    beyond. Thus, the Plan is an "employee pension benefit plan" as that term is defined by ERISA.

4    37.    Furthermore, NEA and NEAMBC, as an arm of NEA, are employee organizations

5    engaged in commerce or an activity affecting commerce as those terms are defined by ERISA.

6    NEA is one of the largest labor unions in the United States, representing many of the country's

7    teachers along with other school personnel.   The NEA has 3.2 million members and is

8    headquartered in Washington, D.C.  It employs over 600 staff at its headquarters and in its

9    regional offices. It has an operating budget for the 2006-2007 fiscal year of $307 million dollars.

10    38.    NEAMBC, a wholly-owned subsidiary of NEA, has regional representatives who

11    conduct training sessions and product presentations to members on the local level. NEAMBC

12    local representatives work with NEA leaders to demonstrate the benefits of association

13    membership to members.   NEA and NEAMBC are employees' beneficiary associations

14    organized in whole or in part for the purpose of establishing the Plan through their involvement,

15    administration and participation in providing retirement and other benefits for NEA members.

16    39.    NEA and NEAMBC established and maintained the Plan as a result of NEA's and

17    NEAMBC's involvement in the set up, administration and operation of the Plan. Specifically,

18    such involvement included:

19        (a)    NEA and NEAMBC selected Nationwide, and then Security Benefit, as

20    the Plan's exclusively endorsed 403(b) providers;

21        (b)    NEA and NEAMBC received millions of dollars of compensation by

22    exclusively endorsing Security Benefit and Nationwide as the Plan's providers, thereby creating

23    an atmosphere of trust and confidence that was exploited by Defendants for their financial gain,

24    and to the detriment of Plan participants. In its marketing materials, for example, NEAMBC

25    states that " NEA b elieves you d eserve nothin g less than unsurpassed service coupled with

26    innovative financial products and world class money managers. Security Benefit gives you both

by blending Main Street philosophy with Wall Street expertise." Putting forth the investment opportunity as a "main street philosophy" took advantage of the trust that NEA and NEAMBC have cultivated with NEA members;

(c)     Upon information and belief, NEA and NEAMBC worked in conjunction with Defendants to set up and design the Plan. NEAMBC is a registered investment adviser that monitors performance of the Plan. It evaluates and tracks such performance monthly, and makes monthly repo rts availab le to NEA m embers.   NEAMBC monitors the satisfaction of NEA members with the Plan, and provides feedback concerning NEA member satisfaction with the Plan;

(d)     NEA and NEAMBC communicated extensively with Plan participants regarding the Plan, Plan assets, and Plan benefits, endorsed the Plan, and aggressively marketed and promoted the Plan;

(e)     NEA and NEAMBC employed representatives who received payments, compensation, or commissions from Security Benefit and Nationwide.  These representatives (unbeknownst to Plan participants) functioned as agents of Nationwide and Security Benefit for the purpose of marketing and promoting the Plan and causing Plan participants to invest their retirement savings in the investment options offered through the Plan.  Since the representatives' payments, compensation, or commission were correlated to a percentage of purchase payments, these representatives of the Plan had a financial incentive to sell more retirement products. Alternatively, these representatives were salaried employees paid by the defendant insurance companies, and thus also had built-in incentives to market and promote selling of the Plan, notwithstanding their fiduciary obligations to the NEA members, who are Plan participants; and

(f)     Upon    information    and    belief,    NEA-    and    NEAMBC-employed representatives also received compensation from Nationwide and/or Security Benefit to market and promote the Plan, thereby providing them with additional incentives to encourage Plan

1   participants to invest their retirement savings in the investment options offered through the Plan,

2   notwithstanding their fiduciary obligations to the NEA members, who are Plan participants.

3       40.    NEA's and NEAMBC 's involvement in the P lan was exhibited b y the close

4   working relationship with Security Benefit and Nationwide throughout the Class Period, and by

5   substantial compensation and financial incentives paid by Security Benefit and by Nationwide to

6   NEAMBC and NEAMBC representatives.

7       41.    Based on the surrounding circumstances, a reasonable person could ascertain the

8   intended benefits, beneficiaries, source of financing, and procedures for receiving benefits with

9   respect to the Plan.  This information was provided in Plan materials and documents prepared

10   and issued by Defendants.  Accordingly, NEA and NEAMBC established and maintained an

11   employee pension benefit plan under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

12       **2.**    **NEA's and NEAMBC's Exclusive Endorsement Arrangements Demonstrate**

13           **NEA's and NEAMBC's Substantial and Meaningful Involvement in the Management and Administration of the Plan**

14       42.    The Department of Labor ("DOL") has clarified by regulation the statutory phrase

15   "established or maintained by an employer"  As set forth in 29 C.F.R. § 2510.3-2(f), only under

16   the following circumstances, is an employer not deemed to have established an employee

17   pension benefit plan:

18       (1) Participation is completely voluntary for employees;

19       (2) All rights under the annuity contract or custodial account are enforceable solely by the employee, by a beneficiary of such employee, or

20       by any authorized representative of such employee or beneficiary;

21       (3) The sole involvement of the employer, other than pursuant to paragraph (f)(2) above, is limited to any of the following:

22

23           (i) Permitting annuity contractors (which term shall include any agent or broker who offers annuity contracts or who makes available custodial accounts within the meaning of section

24           403(b)(7) of the Code) to publicize their products to employees;

25           (ii) Requesting information concerning proposed funding media, products or annuity contractors;

26

(iii) Summarizing or otherwise compiling the information provided with respect to the proposed funding media or products which are made available, or the annuity contractors whose services are provided, in order to facilitate review and analysis by the employees;

(iv) Collecting annuity or custodial account considerations as required by salary reduction agreements or by agreements to forego salary increases, remitting such considerations to annuity contractors and maintaining records of such considerations;

(v) Holding in the employer's name one or more group annuity contracts covering its employees;

(vi) Before February 7, 1978, to have limited the funding media or products available to employees, or the annuity contractors who could approach employees, to those which, in the judgment of the employer, afforded employees appropriate investment opportunities; or

(vii) After February 6, 1978, limiting the funding media or products available to employees, or the annuity contractors who may approach employees, to a number and selection which is designed to afford employees a reasonable choice in light of all relevant circumstances. Relevant circumstances may include, but would not necessarily be limited to, the following types of factors:

(A) The number of employees affected,

(B) The number of contractors who have indicated interest in approaching employees,

(C) The variety of available products,

(D) The terms of the available arrangements,

(E) The administrative burdens and costs to the employer, and

(F) The possible interference with employee performance resulting from direct solicitation by contractors; and

(4) *The employer receives no direct or indirect consideration or compensation in cash or otherwise other than reasonable compensation to cover expenses properly and actually incurred by such employer in the performance of the employer's duties pursuant to the salary reduction agreements or agreements to forego salary increases described in this paragraph (f) of this section.*

(Emphasis added).

43.     The regulation distinguishes between plans in which the sponsor is minimally involved and neutral as to the Plan such that its activities are ministerial in nature, and plans in which the sponsor meaningfully and substantially participates in the administration and/or management of the plan.  When an employer offends the ideal of employer neutrality through its level of involvement in the Plan, the Plan is subject to ERISA.

44.     The regulation, which concerns actions by an *employer* provides useful guidance as to the circumstances under which an *employee organization* will be found to have established an employee pension benefit plan.  Since, by wa y of example, an employer establishes or maintains a plan if it receives compensation in connection with the plan, it stands to reason that the same conduct by an employee organization will cause the employee organization to establish or maintain a plan.

45.     NEA and NEAMBC did not limit themselves to the type of ministerial activity set forth by the DOL in 29 C.F.R. § 2510.3-2(f).  To the contrary, Defendants engaged in the precise type of conduct that establishes a plan under ERISA, namely:

(a)     NEAMBC received millions of dollars from Defendants as the quid pro quo for NEA's exclusive endorsement of the Plan, which constitutes direct compensation from Security Benefit and Nationwide;

(b)     the compensation far exceeded any actual expenses properly and actually incurred by NEAMBC in performance of NEAMBC's duties to market and promote the Plan; and

(c)     the compensation was not by any stretch "reasonable" given the amount of the endorsement payments and the actual costs incurred by NEAMBC.

46.     NEA and NEAMBC were not mere conduits of information in the selection, operation, or administration of the Plan, but rather were closely, actively, and substantially involved in establishing and maintaining the Plan, promoting and monitoring the Plan to NEA

1   members, and aggressively seeking for their own and Security Benefit and Nationwide's
2   pecuniary gain participation in the Plan by NEA members.

3       47.     For the foregoing reasons, the Plan is not exempt from ERISA, and, instead, is an
4   "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C.
5   § 1002(2)(A) subject to all of ERISA's requirements and governing codes and regulations.

## V. ERISA REQUIREMENTS

7       48.     ERISA was enacted to protect, *inter alia*, "the interests of participants in
8   employee benefit plans and their beneficiaries." ERISA § 2(b), 29 U.S.C. § 1001(b).

9       49.     An employee benefit plan, including the Plan here, must be "established and
10  maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

11      50.     ERISA requires that every participant in an employee benefit plan be given a
12  Summary Plan Description (also known as an "SPD"). ERISA §§ 102(a) & 104(b), 29 U.S.C.
13  §§ 1022(a) & 1024(b).

14      51.     ERISA and the Internal Revenue Code ("I.R.C.") require that plans file an Annual
15  Report, Form 5500, with the DOL and the Department of the Treasury. ERISA §§ 103 & 104,
16  29 U.S.C. §§ 1023 & 1024; I.R.C. § 6058(a).

17      52.     The assets of an employee benefit plan, such as the Plan, must be "held in trust by
18  one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a).  In addition to the preceding
19  ERISA requirements, none of which was satisfied by Defendants, the following ERISA
20  provisions are relevant to this lawsuit.

21      53.     ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1) states "the assets of a plan shall never
22  inure to the benefit of any employer and shall be held for the exclusive purposes of providing
23  benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of
24  administering the plan."

25      54.     Notwithstanding exemptions set forth in ERISA § 408, 29 U.S.C. § 1108, none of
26  which are applicable here, ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions

between the Plan and "parties in interest." Specifically, ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> > (A) *sale or exchange, or leasing, of any property between the plan and a party in interest*;
> >
> > (B) lending of money or other extension of credit between the plan and a party in interest;
> >
> > (C) *furnishing of goods, services, or facilities between the plan and a party in interest*;
> >
> > (D) *transfer to, or use by or for the benefit of a party in interest, of any assets of the plan*; or
> >
> > (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.

(Emphasis added).

55.    ERISA § 406(b), 29 U.S.C. § 1106(b), provides:

> A fiduciary with respect to a plan shall not—
>
> > (1) deal with the assets of the plan in his own interest or for his own account,
> >
> > (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
> >
> > (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

56.    ERISA defines a "party in interest" to an employee benefit plan, in relevant part, as: (A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan; (B) a person providing services to such plan; (C) an employer any of whose employees are covered by such plan; and (D) an employee organization any of whose members are covered by such plan. ERISA § 3(14), 29 U.S.C. § 1002(14).

57.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

58.     ERISA § 409(a), 29 U.S.C. § 1109(a), titled "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that

> [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

59.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, and other equitable relief.

60.     ERISA §§ 404(a)(1)(A) & (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provide, in pertinent part, that

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

61.     These fiduciary duties under ERISA §§ 404(a)(1)(A) & (a)(1)(B), 29 U.S.C. §§ 1104(a)(1)(A) & (a)(1)(B), are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things:

(a)     The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including, but not limited to, the mutual funds offered to participants through the Plan;

(b)     The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the

interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)     The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

62.     ERISA § 405(a), 29 U.S.C. § 1105(a), titled "Liability for Breach by Co-Fiduciary," provides, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1)[, 29 U.S.C. § 1104(a)(1),] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

63.     Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility. Because ERISA permits the fractionalization of fiduciary duties, there may be, as in this case, several ERISA fiduciaries involved in a given issue. In the absence of co-fiduciary liability, fiduciaries would be incentivized to ignore the conduct of other fiduciaries. The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified. Co-fiduciary liability obviates this. Even if a fiduciary merely knows of a breach, one he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . . . [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate

> Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co-fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

H.R. Rep. No. 93-1280 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5080, 1974 WL 11542.

64.     Plaintiffs therefore bring this action in part under the authority of ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief under ERISA § 409(a), 29 U.S.C. § 1109(a), to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA §§ 404(a)(1) & 405(a), 29 U.S.C. §§ 1104(a)(1) & 1105(a).

## VI. DEFENDANTS' FIDUCIARY STATUS

65.     ***Named Fiduciaries***.   ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).   The person named as the "administrator" in the plan instrument is automatically a fiduciary, and in the absence of such a designation, the sponsor is the administrator.  *See* ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

66.     ***De Facto Fiduciaries***.   ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

67.     Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its participants under ERISA in the manner and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

1       68.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C.

2   § 1104(a)(1), to manage and administer the Plan and the Plan's assets solely in the interest of the

3   Plan's participants and beneficiaries and "with the care, skill, prudence, and diligence under the

4   circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

5   matters would use in the conduct of an enterprise of a like character and with like aims." ERISA

6   § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). Defendants further were required to avoid engaging

7   in prohibited transactions under ERISA § 406, 29 U.S.C. § 1106, such as flagrant self-dealing.

8   **A.    NEA's, NEAMBC's and the Individual NEAMBC Defendants' Fiduciary Status**

9       69.    NEA and NEAMBC are employee organizations pursuant to ERISA § 3(4),

10   29 U.S.C. § 1002(4), and functioned as the Plan Sponsor and Plan Administrator. *See* ERISA

11   § 3(16), 29 § U.S.C. 1002(16). NEA and NEAMBC also were Plan fiduciaries based on their

12   substantial involvement in the operation, administration, and management of the Plan.

13       70.    NEAMBC was established by NEA as a wholly-owned subsidiary of NEA to

14   operate for the benefit of NEA members. NEAMBC was established to provide certain benefits

15   directly to NEA members, to negotiate with vendors on behalf of NEA members for other benefit

16   programs, including the Plan, and to endorse and monitor benefit programs made available to

17   NEA members, including programs such as the Plan.

18       71.    NEAMBC is an arm of NEA, and functioned on behalf of NEA and as its agent

19   thereof with respect to its involvement in the Plan. As the NEAMBC website states, "NEA

20   Member B enefits is an integr al p art of the N EA or ganization." NEA Member B enefits –

21   Who We Are, http://www.neamb.com/about/ambwwa.jsp (June 25, 2007). On the NEAMBC

22   website, it states, "The NEA Member Benefits Corporation is a subsidiary of the NEA,

23   established to develop, implement and administer NEA Member Benefits programs and services.

24   Its governing body includes a Board of Directors which oversees the corporation to ensure the

25   quality and consistency of the programs." *Id.*

26

72. NEA and NEAMBC functioned as fiduciaries under ERISA by participating in the management and administration of the Plan and Plan assets in a variety of respects. NEA and NEAMBC exclusively endorsed the Plan to their members, and worked closely with Security Benefit and Nationwide to market, promote, and administer the Plan. NEAMBC is a registered investment adviser that monitors performance of the Plan. It evaluates and tracks such performance monthly, and makes monthly reports available to NEA members. NEAMBC monitors the satisfaction of NEA members with the Plan, and provides feedback concerning NEA member satisfaction with the Plan. NEA and NEAMBC have field representatives to provide, upon information and belief, face to face investment counseling. In this way, NEA and NEAMBC have participated in the selection of investments offered in the Plan.

73. NEA and NEAMBC also communicated directly with Plan participants regarding the Plan and Plan assets; such communications constituted fiduciary acts under ERISA. NEA and NEAMBC assured NEA members that they could rely on NEAMBC to perform its functions for their benefit. For example, the website designed by NEAMBC to describe its endorsed products assured prospective investors that "NEA conducted an extensive review of numerous financial services companies to find the best provider for your NEA Valuebuilder Program – a company that understands the unique retirement needs of the education professional. Security Benefit Group of Companies is such a company," NEA Member Benefit Plan – Savings, http://www.neamb.com/savings/vanpge.jsp (June 25, 2007), and "You've always been there for others. Now let others be there for you." NEA Member Benefit Plan – Savings, http://www.neamb.com/savings/vatsa.jsp (June 25, 2007). The website assures NEA members that "Of all the products NEA Member Benefits reviews, only a few are accepted. The great majority of programs simply cannot meet NEA Member Benefit standards. NEA Member Benefits works with the best to bring you the best." About NEA Member Benefits, http://www.neamb.com/about/ambbst.jsp (June 25, 2007). The NEA website also states, "For retirement planning assistance from a person you can trust, call for an appointment with a

representative today: 1-877-NEA-8668." NEA: Exclusive Member Benefits Programs for NEA Members, http://www.nea.org/mbhighlights/mb.html (June 25, 2007).

74.     As a result of the above described conduct, NEA and NEAMBC functioned as fiduciaries for the Plan because they exercised discretionary authority or discretionary control with respect to the management of the Plan, exercised authority and control respecting management or disposition of Plan assets, and had discretionary authority or discretionary responsibility in the administration of the Plan.   *See* ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

75.     Furthermore, as the individuals responsible for oversight, governance and management of NEAMBC, the Individual NEAMBC Defendants acted on behalf of the NEAMBC, and, in that respect, are ERISA fiduciaries pursuant to ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

**B.     Security Benefit's Fiduciary Status**

76.     Security Benefit participated in the administration of the Plan and exercised a variety of fiduciary powers.   Security Benefit held and controlled Plan assets, selected Plan investment options, changed Plan investment options, and, generally, managed and administered the Plan on a day-to-day basis.   In addition, Security Benefit communicated with Plan participants regarding the Plan and Plan assets through marketing and promotional materials, prospectuses, account statements, and other materials provided directly to Plan participants specifically with respect to Plan assets.   Security Benefit also communicated directly with Plan participants through its "individual advisers" who staffed toll-free hot lines for NEA members to call.

**C.     Nationwide's Fiduciary Status**

77.     Nationwide participated in the administration of the Plan and exercised a variety of fiduciary powers.   Nationwide held and controlled Plan assets, selected Plan investment options, changed Plan investment options, and, generally, managed and administered the Plan on

a day-to-day basis. In addition, Nationwide communicated with Plan participants regarding the Plan and Plan assets through marketing and promotional materials, prospectuses, account statements, and other materials provided directly to Plan participants specifically with respect to Plan assets.

78.     As a result of the above described conduct, Security Benefit and Nationwide also functioned as fiduciaries for the Plan because they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority and control respecting management or disposition of Plan assets, and had discretionary authority or discretionary responsibility in the administration of the Plan. *See* ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

## VII. DEFENDANTS' IMPROPER CONDUCT

**A.      Defendants Breached their Duties of Prudence and Loyalty through their Exclusive Endorsement Arrangements**

79.     Although Defendants claimed they were serving the best interests of the NEA members, in fact, Defendants had conflicting interests because they benefited from payments, compensation, commissions and endorsement fees, and selected retirement services providers on that basis rather than on a basis that served the best interests of the Plan participants.

80.     The NEA website states "For retirement planning assistance from a person *you can trust*, call for an appointment with a representative today: 1-877-NEA-8668." NEA: Exclusive Member Benefits Programs for NEA Members, http://www.nea.org/mbhighlights/mb.html (June 25, 2007) (emphasis added). NEA members were led to believe that by calling NEAMBC they would reach an NEAMBC representative they could "trust," when, in fact, the telephone line was manned by Security Benefit representatives with conflicted interests as they earned commissions based on selling the Plan to NEA members.

81.     Security Benefit and Nationwide received payments from the open-end management investment companies ("Investment Entities"), and profited from these payments. Security Benefit and Nationwide considered the amounts of the payments made to them when

1  selecting which mutual funds and investment options to include in the menu of investments
2  offered to Plan participants. Indeed, upon information and belief, Investment Entities that did
3  not make such payments to Security Benefit and Nationwide were not included in the
4  Valuebuilder investment menu.

5      82.    Security Benefit and Nationwide, in turn, paid NEA through NEAMBC royalty
6  payments in the form of endorsement fees. The amount of royalties and endorsement fees
7  NEAMBC received was significant. According to an L.A. TIMES article of April 25, 2006, "[t]he
8  National Education Assn . . . collected nearly $50 million in royalties in 2004 on the sale of
9  annuities, life insurance and other financial products it endorses." *Union's Advice is Failing*
10 *Teachers*, LOS ANGELES TIMES, Apr. 25, 2006, at A1.

11     83.    While the NEAMBC website disclosed that it received an annual fee from
12 Security Benefit "for certain services" under its agreement with NEAMBC, NEAMBC never
13 disclosed what exactly those services are, and how much it has received for those services.
14 NEA Member Benefit Plan – Savings, http://www.neamb.com/savings/vanpge.jsp (June 25,
15 2007). One Security Benefit prospectus discloses paying "a fee" to NEAMBC of $510,000 per
16 quarter, but it is not clear what this fee is for, and if this is the extent of payments made to
17 NEAMBC.    NEA Valuebuilder Variable Annuity Prospectus 23 (May 1, 2007),
18 https://nea.securitybenefit.com/Com/ProductData/Prospectus/ProspectusDoc/neavbva/NEA-
19 VA.pdf ("2007 Variable Annuity Prospectus").

20     84.    Nationwide and Security Benefit paid salaries for NEAMBC representatives.
21 Thus, NEAMBC was incentivized by the endorsement payments to expand Security Benefit's
22 and Nationwide's business in conflict with the interests of its members. According to the L.A.
23 TIMES article published on April 25, 2006:

24         The NEA receives royalties on sales of Valuebuilder and other financial
        products it endorses. Union officials declined to say how the royalties
25         were calculated or how much money union-endorsed retirement plans
        brought in. They are, however, required by federal law to disclose the
26         total revenue from all endorsement deals. The most recent disclosure on
        file with the Labor Department shows that the NEA received $49.6 million

from Security Benefit Life Insurance, the provider of Valuebuilder, and other endorsed companies in 2004. Among other things, that money pays the salaries of 110 union employees, said Ronald Mentzer, treasurer of NEA Member Benefits in Gaithersburg, MD. In addition to its direct payments, Security Benefit sponsors dozens of NEA conferences each year.

. . .

Local unions that help promote NEA-endorsed products get a share of the royalties. The Florida Education Assn, for example, collected $140,000 in "program royalties" last year, federal records show. The Illinois Education Assn. received $178,148, while the Maine Education assn. was paid $33,610.

85.     Security Benefit has also paid local NEA affiliates. In 2006, for example, Security Benefit paid local NEA associations, including the Education Minnesota Foundation, over *$2 million* in connection with "charitable golf tournaments and other charitable events."

86.     Contrary to what they told NEA members, the NEAMBC supported Security Benefit and Nationwide in their sales efforts, accompanying Security Benefit and Nationwide sales agents to conferences where Security Benefit and Nationwide marketed their products.

87.     At no point during the Class Period did Defendants fully, fairly or adequately disclose or explain that NEAMBC's endorsement of the Plan was bought and paid for by Nationwide and Security Benefit, and that NEAMBC had a financial incentive to help Nationwide and Security Benefit sell the Plan, nor that Nationwide and Security Benefit received revenue sharing payments for including Investment Entities' funds in the Plan's investment options menu. Whereas the Plan was billed as being in the best interests of Plan participants, in fact, Defendants used the Plan to serve their own best interests at the expense of Plan participants and beneficiaries.

88.     While Defendants provided some details regarding the compensation that NEAMBC received from Nationwide and Security Benefit, in short, at no point did they inform participants that the compensation was the *quid pro quo* for the all important exclusive endorsement by the NEA.

89.     Defendants flag rantly abused their position s of trust and their du ties as Plan fiduciaries and in so doing caused the Plan and Plan participants to incur excessive fees and investment losses caused by Defendants' imprudent and disloyal actions.  Prudent, loyal plan fiduciaries would have actively managed the Plan in order to ensure that it was operating in the best interests of Plan participants.  Here, on the other hand, Defendants operated the Plan in a manner to maximize their own financial benefits regardless of the impact on Plan participants' retirement savings.

**B.      Defendants Breached their Fiduciary Duties under ERISA by Charging Excessive Fees and Failing to Adequately Monitor the Plan to Ensure that It was Administered and Maintained in the Best Interests of Plan Participants**

90.     Under ERISA, fiduciaries are required to operate plans in the best interests of participants for the exclusive purpose of providing retirement benefits.  As the DOL has made clear in advisory opinions and other publications, to do so, plan fiduciaries must:

(a)     Establish a prudent process for selecting investment alternatives and service providers;

(b)     Ensure that fees paid to service providers and other expenses of the plan are reasonable in light of the level and quality of services provided;

(c)     Select investment alternatives that are prudent and adequately diversified; and

(d)     Monitor investment alternatives and service providers once selected to see that they continue to be appropriate choices.

91.     Here, Defendants failed to ensure that the fees paid with Plan assets were reasonable and for necessary services.  Throughout the Class Period, there were equally good or better, lower cost investment alternatives available to the Plan.

92.     As has been reported, the fees charged by the Plan were grossly excessive.  According to an April 25, 2006, L.A. TIMES article:

> Buyers of an NEA-endorsed annuity sold by Security Benefit Life Insurance Co. pay annual fees totaling at least 1.73% of their savings.

> That is about 10 times as much as they would pay in 403(b) plans available from Vanguard Group, T. Rowe Price and other low-cost mutual fund providers. The costliest option in the NEA-endorsed plan charges 4.85% a year. That means an investor would have to earn a return of 5% just to break even.
>
> . . .
>
> A fee that large can ravage retirement savings over time. A teacher who contributed $500 a month and earned an average of 10% a year would have $379,684 after 20 years. But if 4.85% in fees were deducted each year, the nest egg would amount to just $209,114.

93.     As high as they are, the standard fees identified in the L.A. TIMES article, in fact, appear to be lower than the amounts set forth in current Plan materials. For example, as stated in the May 1, 2006, NEA Valuebuilder Variable Annuity Prospectus, fees assessed against Plan participants' retirement savings included: (1) the annual Administrative Fee of 0.15%; (2) the annual Mortality and Expense Fee of 0.90%; (3) the annual Contract Fee of $30; (4) a Deferred Sales Charge (a.k.a. Withdrawal Charge) of 7% decreased by 1% for each year participants kept their retirement savings in the Plan; and (5) asset management fees charged against and deducted from the amounts participants invested in the various funds offered via the Plan, which ranged between 0.78% and 2.57 % depending on fund selections within the Plan. Hence, the fees charged against the retirement savings of teachers and other school employees were excessive and, by reaching a level as high as 10.62%, could be characterized as being truly absurd.

94.     As to the fifth category of fees, Nationwide and Security Benefit compounded the excessive expense of the Plan by selecting high cost funds despite the ready availability of comparable and better lower cost options. For example, one option offered to Plan participants is a Dreyfus fund designed to track the Standard and Poor's 500 stock index. The total operating expense for the Valuebuilder Dreyfus stock index fund in 2006 was 0.30%. That is over three times the 0.09% operating expense on Admiral Shares in Vanguard's Index 500 fund. Prudent fiduciaries do not select investment options that cost over three times more than a comparable product.

95.     While the mandatory fees participants must pay in the Plan are themselves extremely high, selection of various optional "benefits" increase the fees even more. According to the May 1, 2006, NEA Valuebuilder Variable Annuity Prospectus, participants also can get hit with a 1.55% Maximum Annual Charge for Optional Riders. This means that participants may end up with total fees as high as 12.17%. As a result of this massive fee burden, participants' abilities to derive any meaningful investment return from the NEA Valuebuilder Plan are remote.

96.     The impact of excessive retirement plan fees is well known in the industry. In the November 2006 report by the Government Accountability Office ("GAO") regarding 401(k) plan fees, *Private Pensions Changes Needed to Provide 401(k) Plan Participants and the Department of Labor Better Information on Fees* ("GAO Fees Report"), the GAO described the impact that excessive fees have on retirement savings:

> Over the course of the employee's career, fees may significantly decrease retirement savings. For example, a 1-percentage point difference in fees can significantly reduce the amount of money saved for retirement. Assume an employee of 45 years of age with 20 years until retirement changes employers and leaves $20,000 in a 401(k) account until retirement.   If the average net is 6.5 percent—a 7 percent investment return minus a 0.5 percent charge for fees—the $20,000 will grow to about $70,500 at retirement. However, if fees are instead 1.5 percent annually, the average net return is reduced to 5.5 percent, and the $20,000 will grow to only about $58,400. The additional 1 percent annual charge for fees would reduce the account balance at retirement by about 17 percent.

GAO Fees Report at 7, available at *http://www.gao.gov/new.items/d0721.pdf*.

97.     Here, the affect of excessive fees is even more dramatic because the fees are outrageously high. Participants may invest their retirement savings for years in the fund options offered to them in the Plan with little to no investment return. NEAMBC statements such as "You've always been there for others. Now let others be there for you;" and "NEA Member Benefits works with the best to bring you the best" ring hollow in the face of the reality of the fees-burdened Plan.

1    98.    Thus, here, as a result of Defendants' failure to prudently and loyally manage

2  Plan assets and ensure that fees paid from Plan accounts were reasonable, Plan participants'

3  retirement savings have been substantially diminished.

4    99.    All told, the Plan fiduciaries essentially made no effort to ensure that the Plan was

5  only charged reasonable fees, and instead focused on maximizing the profit Defendants could

6  make from Plan participants.

7    100.    By failing to ensure that fees paid from Plan assets were reasonable, Defendants

8  breached their fiduciary duties under ERISA.

9    101.    An adequate investigation by an impartial fiduciary would have revealed that the

10  fees charged to Plan participants were unreasonable and the investment options selected by

11  Defendants were not in the Plan participants' best interests.

12  **C.    Security Benefit and Nationwide Engaged in Improper Revenue Sharing Arrangements with Investment Entities**

13    102.    Under the Plan, Security Benefit and Nationwide were responsible for selecting

14  the different mutual fund and investment options offered to Plan participants. Security Benefit[4]

15  controlled this process in all respects. It selected the investment options to include in the Plan's

16  investment menu and had the authority to add or remove investment options at its discretion.

17  NEAMBC retained the authority to monitor and evaluate the investment options in order to

18  ensure that investment options were appropriate for NEA members. It failed to exercise this

19  authority for the benefit of the Plan participants.

20    103.    Technically, Plan participants in the group annuity contracts did not invest

21  directly in the mutual funds and other investment options Security Benefit selected. Rather, they

22

23

24

25

26

---

[4] As previously alleged in this Complaint, upon information and belief, Security Benefit is liable under a theory of successor liability for Nationwide because Nationwide is the predecessor administrator of the Plan and Security Benefit assumed all liability from Nationwide pursuant to their contractual agreement. To the extent that Nationwide presently offers contracts under the Plan, it is also concurrently and independently liable. Accordingly, all references to Security Benefit in this section and in this Complaint hereby also incorporate Nationwide. All references to Nationwide refer to both it as the exclusively endorsed provider of the Plan from 1991 until 2000 and as a current provider of contracts under the Plan.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA
(Cause No. _____)                    Page - 31

1  invested in a "Separate Account" individually established by Security Benefit.  The Separate
2  Account established by Security Benefit kept its assets separate from the general assets of
3  Security Benefit and were not chargeable with any of Security Benefit's liabilities outside of the
4  Separate Account.

5  104.   The Separate Account was divided into sub-accounts that corresponded to the
6  mutual funds and other investment options available under the annuity contracts.  Pursuant to the
7  contracts, Plan participants chose (from the available options) the investments in which their
8  contributions were invested and Security Benefit allocated those contributions to the particular
9  sub-accounts within the Separate Account which correspond to the chosen investment options.
10  In return for their contributions, participants received accumulation units (shares) of the Separate
11  Account, which accumulation units were held by Security Benefit ("Accumulation Units").  In
12  this respect, the Separate Account was like a mutual fund.  When people invest in a mutual fund,
13  they own shares of the mutual fund; they do not have an ownership interest in the underlying
14  stocks owned by the mutual fund.

15  105.   Based on the combined contributions to the sub-accounts made by the Plan
16  participants, Security Benefit sold and purchased mutual funds or other investment shares for the
17  Separate Account.   The value of a Plan participant's Accumulation Units in the Separate
18  Account fluctuated based upon the value of the shares held within the various sub-accounts.

19  106.   Mutual funds generally do not have employees and must contract with various
20  entities to perform managerial, administrative, accounting, legal, and other services.  Mutual
21  funds pay the entities providing those services.  Mutual funds pass those costs on to its investors
22  by charging them a variety of fees, typically investment management fees, distribution fees or
23  commissions, and marketing or 12(b)(1) fees.  A mutual fund takes these fees from investors by
24  paying to the investment manager, mutual fund advisor, or other service provider out of its
25  general assets a dollar amount equal to the designated percentage of the net asset value of all of
26  its shares, which causes the net asset value of all its shares to decrease by that percentage.  Thus,

1    here, this caused the value of the mutual fund shares and other investment options held by
2    Security Benefit in the Separate Account to decrease by that percentage, which in turn reduced
3    the value of each Plan participant's Accumulation Units in the Separate Account
4    correspondingly.    The a llegations made in this section against Security Benefit are equall y
5    alleged against Nationwide.

6    107.    Despite their special relationships to NEA members as the exclusively endorsed
7    403(b) annuity providers and their status as ERISA fiduciaries, Security Benefit and Nationwide
8    implemented and maintained arrangements whereby Investment Entities made revenue sharing
9    payments to Nationwide and Security Benefit based upon a percentage of the Plan participants'
10    assets invested in the mutual funds or other investments through Nationwide and Security
11    Benefit.    Upon information and belief, the revenue sharing payments became a condition to
12    including a mutual fund family's funds in the platform of investments offered to Plan
13    participants. The revenue sharing payments were the tickets for admission to the Plan.

14    108.    While, as noted above, the revenue sharing payments were calculated as a
15    percentage of Plan participants' assets invested in the mutual funds or other investments through
16    Security Benefit and Nationwide the payments bore no relationship whatsoever to the cost of
17    providing the services or a reasonable fair market value for the services. Simply put, whether a
18    participant had $10,000 or $100,000 in his or her account, the cost to handle transactions and
19    maintain records was the same. Furthermore, the provision of these services was an inherent part
20    of Nationwide's and Security Benefit's businesses, such that the services provided by
21    Nationwide and Security Benefit actually had no reasonable fair market value at all.    Indeed.
22    upon information and belief, prior to their implementation of the revenue sharing arrangements,
23    Nationwide and Security Benefit provided the same services to the Investment Entities free of
24    charge.

25    109.    While Nationwide and Security Benefit may describe the revenue sharing
26    payments as payments for services provided to the Investment Entities, this is merely a ruse. At

best, any services provided were nominal and the payments, which were substantial, far exceeded reasonable compensation for those services. In reality, the Investment Entities were not paying Nationwide and Security Benefit for the performance of services—rather they were paying Nationwide and Security Benefit to include their funds in the investment menu of the Plan. Security Benefit and Nationwide have thus both misused Plan participants' assets and mismanaged the assets by selecting investment options based on revenue sharing payments as opposed to a prudent evaluation of the merits of the investment options. Based on Nationwide's and Security Benefit's revenue sharing arrangements, Nationwide and Security Benefit chose expensive funds that provided them revenue sharing payments rather than comparable (or better) performing lower cost options.

110. The revenue sharing payments received by Nationwide and Security Benefit were inappropriate for another fundamental reason: participants bore the cost of the revenue sharing arrangements. This is because the Investment Entities who participated in Nationwide and Security Benefit's revenue sharing arrangements covered the cost of the revenue sharing payments by increasing the fees charged to Plan participants' shares in the Separate Account. Thus, Plan participants both paid for and suffered from Nationwide's and Security Benefit's revenue sharing arrangements.

111. The Plan fiduciaries had a fiduciary obligation to ensure that fees and expenses incurred by the Plan were reasonable for the services provided and were incurred for the sole benefit of Plan participants and beneficiaries. By choosing mutual funds and other investments based on revenue sharing payments as opposed to the prudent evaluation of the merits of the funds as Plan investment options, Nationwide and Security Benefit breached their fiduciary obligations. In addition, by using Plan assets for their own benefit, and by engaging in transactions dealing with Plan assets with parties in interest, Defendants engaged in prohibited transactions under ERISA.

**D.   Defendants Failed to Provide Complete and Accurate Information to Plan Participants Regarding Endorsement Fees Paid to NEAMBC and Revenue Sharing Payments Paid to Security Benefit and Nationwide**

112.   In the course of their management and administration of the Plan, Defendants had an ongoing fiduciary obligation to provide Plan participants with information that they knew or should have known was critical to Plan participants' making informed decisions regarding the Plan and Plan investments.   Contrary to this responsibility, Defendants failed to provide complete and accurate information regarding the relationship between NEA and NEAMBC on the one hand, and Security Benefit and Nationwide on the other hand, including but not limited to, the profit incentive that existed to sell the Plan, and the fact that NEA's exclusive endorsement of Nationwide and Security Benefit was the direct result of compensation paid to NEAMBC by the defendant insurance companies.

113.   NEAMBC's website states that NEAMBC selected Security Benefit because it offered the most competitive product.   The website states, "The NEA conducted an extensive review of numerous financial services companies to find the best provider for your NEA Valuebuilder Program." NEA Member Benefit Plan – Savings, http://www.neamb.com/ savings/vanpge.jsp (June 25, 2007).   The website continues, "Of all the products NEA Member Benefits reviews, only a few are accepted.   The great majority of programs simply cannot meet NEA   Member   Benefits   standards."   About   NEA   Member   Benefits, http://www.neamb.com/about/ambbst.jsp (June 25, 2007).

114.   NEAMBC claimed that it selected Security Benefit based upon the best interests of NEA members, and not based on any profit incentive.   The website states, "[t]he NEA does not profit from NEA Member Benefits programs.   The goal of NEA Member Benefits is to break even – **no program is supported by dues dollars**.   NEA Member Benefits also demands strict criteria from prospective corporate providers."   *Id.*   The website continues, "the NEA selected Security Benefit as the exclusive provider of the NEA Valuebuilder Program because of its unsurpassed   service   coupled   with   innovative   financial   products   and   world-class   money

1  managers." NEA Member Benefit Plan – Savings, http://www.neamb.com/savings/vatsa.jsp
2  (last visited June 25, 2007).

3      115.   Despite the picture NEA and NEAMBC paint that it chose Security Benefit for
4  the NEA Valuebuilder plan based on competitive criteria in the best interests of the participants,
5  and without any profit motive, in fact, NEAMBC selected Nationwide and Security Benefit
6  based on the commissions and endorsement fees that Security Benefit and Nationwide paid to
7  NEAMBC to be the exclusive provider of the Plan.

8      116.   While the NEAMBC website disclosed that it received an annual fee from
9  Security Benefit "for certain services" under its agreement with NEAMBC, NEAMBC never
10  disclosed what exactly those services were and how much it received for those services. NEA
11  Member Benefit Plan – Savings, http://www.neamb.com/savings/vanpge.jsp (June 25, 2007).
12  One Security Benefit prospectus disclosed paying "a fee" to NEAMBC of $510,000 per quarter,
13  for example, but it is still not clear what this fee was for and if this was the total extent of
14  payments made to NEAMBC. At no point did Security Benefit disclose that it paid the fee for
15  the purpose of obtaining the NEA exclusive endorsement. 2007 Variable Annuity Prospectus,
16  at 23.

17      117.   Similarly, the current Nationwide prospectuses do not give any information on
18  how much Nationwide pays NEAMBC a year for services under its agreement. It does state that
19  Nationwide pays commissions to firms that sell contracts, but it is not clear who these firms are.

20      118.   Neither Security Benefit nor Nationwide ever disclosed that they paid NEAMBC
21  representative's salaries, or that these staff members were actively involved in marketing the
22  Plan to NEA members for Defendants' pecuniary gain. Contrary to the impression created by
23  Defendants, these staff members served Defendants' interests and not the best interests of NEA
24  members, who are Plan participants.

25      119.   Furthermore, Defendants did not give complete and accurate information on the
26  revenue sharing payments that Security Benefit and Nationwide received for including

CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA
(Cause No. _____)                    Page - 36

1    Investment Entities funds in the Plan's menu of investment options.   The May 1, 2007,

2    Nationwide NEA Valuebuilder Select Annuity Prospectus ("2007 Select Annuity Prospectus"),

3    for example, stated the following:

> Nationwide may consider several criteria when identifying the underlying
> mutual funds, including some or all of the following: investment
> objectives, investment process, investment performance, risk
> characteristics, investment capabilities, experience and resources,
> investment consistency, and fund expenses. *Another factor Nationwide
> considers during the identification process is whether the underlying
> mutual fund's adviser or subadviser is one of our affiliates or **whether the
> underlying mutual fund, its adviser, its subadviser(s), or an affiliate will
> make payments to us or our affiliates**.*

9    2007 Select Annuity Prospectus, at 12, https://nea.securitybenefit.com/Com/ProductData

10   /Prospectus/ProspectusDoc/ncavbva/NEA_Select.pdf (emphasis added).

11          120.   The Security Benefit 2007 Variable Annuity Prospectus similarly provides:

> ***The Company (and its affiliates) may receive payments from the
> Underlying Funds, their advisers, sub-advisers, and distributors, or
> affiliates thereof.*** The Company negotiates these payments and thus they
> differ by Underlying Fund (sometimes substantially), and the amounts the
> Company (or its affiliates) receive may be significant.

. . .

> The Company selects the Underlying Funds offered though the Contract
> based on several criteria, including asset class coverage, the strength of the
> investment adviser's (or sub-advisor's) reputation and tenure, brand
> recognition, performance, and the capability and qualification of each
> investment firm. ***Another factor the Company considers during the
> selection process is whether the Underlying Fund, its advisor, its sub-
> adviser, or an affiliate will make payments to the Company or its
> affiliates as described above.***

20   2007 Variable Annuity Prospectus, at 25 (emphasis added).

21          121.   Neither Security Benefit nor Nationwide provided complete and accurate

22   information in their prospectuses or corporate marketing literature to participants that the

23   *primary* reason for selecting certain underlying mutual funds was because of the payments those

24   mutual funds made to Security Benefit and Nationwide.   Whereas in some Plan materials,

25   Defendants disclosed that they received payments from Investment Entities, they failed to reveal

26   that such payments were the *quid pro quo* for including funds in the Plan's investment menu.

Instead, they suggest that revenue sharing payments are just one factor among several, as opposed to mandatory payments without which the Investment Entities' fund(s) would not be offered to participants. Nor did they inform participants that regardless of cost or performance, only funds that provided revenue sharing payments were offered to Plan participants. Despite the selection process described by Defendants, in truth, the process was driven by revenue sharing payments.

122.   By failing to provide complete and accurate information regarding NEAMBC's relationships with Security Benefit and Nationwide, and Security Benefit and Nationwide's relationships with the underlying mutual funds, Defendants breached their fiduciary duties under ERISA.

## VIII.  CAUSES OF ACTION

### Count I:

#### (Failure to Prudently and Loyally Manage Plan Assets in Violation of ERISA Section 404(a)(1))

123.   Plaintiffs incorporate herein the allegations set forth above.

124.   This Count is alleged against all Defendants.

125.   As alleged above, NEA and NEAMBC, are fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because of their discretionary authority, control, and responsibility with respect to the Plan and Plan assets through, *inter alia*, their endorsement of the Plan, involvement in the review of Plan investment options, and extensive communications with Plan participants regarding the Plan and plan assets. In addition, as the individuals responsible for oversight, governance and management of the NEAMBC, and, thus, who operated on behalf of the NEAMBC in carrying out their fiduciary duties to the Plan, the Individual NEAMBC Defendants also functioned as fiduciaries pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

126.   NEAMBC is a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because of its discretionary authority and responsibility with respect to the

1  administration of the Plan and authority and c ontrol of Plan assets, through, *inter alia*, its

2  management and administration of the Plan on a day-to-day basis, selection of Plan investment

3  options, communications with participants regarding the Plan and Plan assets.

4      127.  As fiduciaries, Defendants were bound by the duties of loyalty, exclusive purpose

5  and prudence pursuant to ERISA § 404(a)(1)(A) & (a)(1)(B), 29 U.S.C. § 1104(a)(1)(A) &

6  (a)(1)(B).

7      128.  Here, Defendants breached these duties in a variety of respects.  Specifically,

8  NEA, NEAMBC, and the Individual NEAMBC Defendants breached their fiduciary duties by,

9  *inter alia*:

10      (a)  Failing to adequately investigate and evaluate the Plan before endorsing it

11  exclusively as the 403(b) investment program for NEA members;

12      (b)  Exclusively endorsing the Plan to NEA members when they knew, or, in

13  the exercise of reasonable care should have known, that the expenses of the Plan were

14  substantially higher than those of equivalent products available in the marketplace;

15      (c)  Accepting substantial endorsement fees from Security Benefit, failing to

16  use such fees to defray the reasonable costs of administering the Plan, and by putting their own

17  pecuniary interests ahead of the NEA members, including Plan participants and beneficiaries, in

18  this regard;

19      (d)  Actively promoting Security Benefit's and Nationwide's interests to the

20  detriment of NEA members, including Plan participants and their beneficiaries; and

21      (e)  Failing in any manner to remedy the conflicts of interest they possessed

22  with respect to Plan participants as a result of Security Benefit's and Nationwide's payment of

23  millions of dollars to NEAMBC to endorse, support, promote and expand the Plan.

24      129.  Security Benefit and Nationwide breached their fiduciary duties of loyalty,

25  exclusive purpose and prudence by, *inter alia*:

26

1    (a)    Paying substantial endorsement fees to NEAMBC as the *quid pro quo* for

2    NEA's and NEAMBC's endorsement of the Plan;

3    (b)    Charging unreasonable and excessive fees for administering the Plan;

4    (c)    Selecting investment options based on revenue sharing payments paid to

5    NEAMBC by Investment Entities as opposed to based on a prudent evaluation of the merits of

6    the investments, which constituted disloyal self-dealing;

7    (d)    Taking for their own use and gain revenue sharing payments despite the

8    fact that such payments were Plan assets that NEAMBC was required to manage and maintain

9    for the exclusive benefit of Plan participants;

10    (e)    Causing Plan participants to bear the costs of the revenue sharing

11    payments through increased fees charged to Plan accounts by Investment Entities even though

12    Plan participants received no benefit from the arrangements and, to the contrary, suffered

13    substantial losses because of them;

14    (f)    Actively promoting their own financial interests to the detriment of NEA

15    members, including Plan participants and their beneficiaries, when dealing with members of

16    NEAMBC; and

17    (g)    Failing in any manner to remedy the conflicts of interest they possessed

18    with respect to Plan participants as a result of (1) the millions of dollars of payments they made

19    to NEAMBC to endorse the Plan, and (2) revenue sharing payments they received from

20    Investment Entities.

21    130.    An adequate investigation by any of the Defendants would have revealed to a

22    reasonable fiduciary that the Plan was operated in a manner that was not in the best interests of

23    Plan participants, and that Defendants were acting imprudently, disloyally and not for the

24    exclusive purpose of providing retirement benefits to Plan participants and their beneficiaries.

25    131.    As a direct and proximate result of these breaches of fiduciary duty by

26    Defendants, the Class (defined *infra*) suffered damages in the tens of millions of dollars.

132.    Pursuant to ERISA §§ 409(a), 502(a)(2) & (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### Count II:

### (Failure to Provide Complete and Accurate Information in Violation of ERISA Section 404(a)(1))

133.    Plaintiffs incorporate herein the allegations set forth above.

134.    This Count alleges fiduciary breaches against all Defendants.

135.    As alleged above, during the Class Period Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose and prudence.

136.    As further alleged above, Defendants communicated extensively with Plan participants regarding the Plan and Plan assets, which is an act of Plan administration, and, thus, were fiduciaries in this respect.

137.    The duty of loyalty under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options such that participants can make informed decisions with regard to participation in the Plan and investment options available under the Plan.

138.    Defendants breached their ERISA duty to inform participants by failing to provide complete and accurate information regarding the Plan.

139.    Specifically, NEA, NEAMBC, and the Individual NEAMBC Defendants breached their duty to inform by:

1      (a)    Failing to provide complete and accurate information to Plan participants

2  regarding their endorsement of the Plan, the amounts paid to NEAMBC by Security Benefit and

3  Nationwide for the endorsement, the financial incentives that NEAMBC possessed to maintain

4  and increase participant participation in the Plan, and other financial support paid to NEAMBC

5  by Security Benefit and Nationwide;

6      (b)    Failing to disclose to Plan participants the conflicts of interest that

7  NEAMBC had as a result of the financial incentives and other financial support paid to it by

8  Security Benefit and Nationwide; and

9      (c)    Failing to disclose to Plan participants that NEA's and NEAMBC's

10  endorsement of the Plan was the result of compensation paid to NEAMBC and not an evaluation

11  of the Plan based on the merits of whether it was in the best interests of Plan participants.

12      140.    Security Benefit and Nationwide breached their ERISA duty to inform by:

13      (a)    Failing to provide complete and accurate information to Plan participants

14  regarding NEAMBC's endorsement of the Plan, the amounts paid to NEAMBC by Security

15  Benefit and Nationwide for the endorsement, the financial incentives that NEAMBC possessed

16  to maintain and increase participation in the Plan, and other financial support paid to NEAMBC

17  by Security Benefit and Nationwide;

18      (b)    Failing to disclose to Plan participants the conflicts of interest that

19  NEAMBC had as a result of the financial incentives and other financial support paid to it by

20  Security Benefit and Nationwide;

21      (c)    Failing to fully, fairly or adequately disclose to Plan participants their

22  revenue sharing arrangements with Investment Entities whereby Security Benefit and

23  Nationwide received and retained for their own account revenue sharing payments from

24  Investment Entities;

25

26

1          (d)     Failing to disclose that they selected investment options primarily based

2  on revenue sharing arrangements as opposed to an objective evaluation of the merits of the

3  options; and

4          (e)     Failing to disclose to Plan participants that, notwithstanding their

5  extensive marketing directly to NEAMBC touting the benefits of the Plan, the Plan was not

6  operated for the exclusive purpose of providing retirement benefits to Plan participants, was

7  substantially more expensive than other readily available comparable plans that were not

8  endorsed by NEA, and, thus, that the Plan was not in Plan participants' best interests.

9      141.    As a consequence of the failure of Defendants to satisfy their duty to provide

10  complete and accurate information under ERISA, Plan participants lacked sufficient information

11  to make informed choices regarding the investment of their retirement savings in the Plan.

12     142.    Defendants' failure to provide complete and accurate information regarding the

13  Plan was uniform and Plan-wide, and impacted all Plan participants the same way in that none of

14  the Plan participants received crucial, material information regarding the NEAMBC's

15  endorsement of the Plan, and details pertaining thereto, or Security Benefit's and Nationwide's

16  revenue sharing arrangements with Investment Entities.

17     143.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered

18  tremendous losses.    Had Defendants discharged their fiduciary duties to prudently disclose

19  material information, the losses suffered by the Plan would have been minimized or avoided.

20  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the

21  Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement

22  savings.

23     144.    Pursuant to ERISA §§ 409(a), 502(a)(2) & (a)(3), 29 U.S.C. §§ 1109(a),

24  1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their

25  breaches of fiduciary duties alleged in this Count and to provide other equitable relief as

26  appropriate.

**Count III:**

**(Prohibited Transactions Pursuant to ERISA Sections 406(a)(1) and 406(b)(1) & (b)(3))**

145.    Plaintiffs incorporate herein the allegations set forth above.

146.    This Count is alleged against all Defendants.

147.    As alleged above, during the Class Period, Security Benefit and Nationwide were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Security Benefit and Nationwide were also parties in interest as that term is defined in ERISA § 3(14), 29 U.S.C. § 1002(14), in that they were fiduciaries and also provided services to the Plan. Also as alleged above, during the Class Period, NEAMBC was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). NEA also was a party in interest as that term is defined in ERISA § 3(14), 29 U.S.C. § 1002(14), in that it was a fiduciary and also an employee organization whose members participated in the Plan. As such, Security Benefit, Nationwide, NEA and NEAMBC were subject to the prohibited transactions provisions of ERISA and the regulations pertaining thereto.

148.    Pursuant to ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), fiduciaries are prohibited from using their authority over plan assets to cause themselves to receive a benefit. Thus, if the Plan sponsor or other fiduciary used its authority to place Plan assets with an Investment Entity who returned the favor through the payments of any benefit, a prohibited transaction occurred. It is also a prohibited transaction for plan fiduciaries to receive compensation for their own personal accounts from any party dealing with such plan in connection with a transaction involving the assets of the plan. *See* ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

149.    The Plan accounts and the retirement savings invested therein are Plan assets. In addition, the revenue sharing payments received by Security Benefit and Nationwide from Investment Entities are themselves Plan assets: Security Benefit and Nationwide received, and upon information and belief, held the revenue sharing payments as a result of their status as fiduciaries or their exercise of fiduciary discretion, control or authority, and at the expense of

1  Plan participants or beneficiaries.  To wit, Security Benefit and Nationwide received payments

2  from Investment Entities in exchange for offering their funds as investment options to Plan

3  participants, and the fees charged to the Plan participants' shares in the Separate Accounts by the

4  Investment Entities covered not only the fees they would have normally charged, but also the

5  amount of the revenue-sharing payments they had to make to Security Benefit and Nationwide.

6  In addition, the revenue sharing payments came at the expense of Plan participants in that in

7  exchange for the payments, Security Benefit and Nationwide selected funds that were far more

8  expensive than other readily available comparable funds.

9      150.    Security Benefit and Nationwide engaged in prohibited transactions pursuant to

10 ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with Plan assets in their own interest and

11 for their own accounts.  Specifically, Security Benefit and Nationwide improperly used Plan

12 assets to generate revenue sharing payments and retained for their own use revenue sharing

13 payments they received from Investment Entities.

14     151.    Security Benefit and Nationwide engaged in prohibited transactions pursuant to

15 ERISA § 406(b)(1) & (b)(3), 29 U.S.C. § 1106 (b)(1) & (b)(3), by receiving compensation for

16 their own personal accounts from a party dealing with the Plan in connection with a transaction

17 involving the assets of the Plan.  Specifically, the revenue sharing payments constituted

18 compensation from a party dealing with the Plan (Investment Entities) in connection with a

19 transaction (the purported provision of services to the Plan by the Investment Entities) involving

20 Plan assets (the shares held in Plan accounts on which the revenue sharing was based and which

21 bore the costs of the payments directly or indirectly).

22     152.    Because Security Benefit and Nationwide used their fiduciary authority, control

23 and responsibility to select mutual funds investment options to include in the Plan's investment

24 menu and received substantial payments for so doing that far exceeded what could possibly be

25 considered reasonable compensation for the provision of any actual services to the Plan, Security

26 Benefit and Nationwide engaged in prohibited transactions pursuant to ERISA § 406(b)(1) &

(b)(3), 29 U.S.C. § 1106(b)(1) & (b)(3).  Security Benefit's and Nationwide's direct pecuniary interest in their transactions with the Investment Entities compromised their exercise of their best judgment as fiduciaries.

153.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), prohibits fiduciaries from engaging in a transaction if they know or should know that it constitutes, *inter alia*, the use by or for the benefit of a party in interest of any assets of the Plan.  Security Benefit and Nationwide engaged in prohibited transactions in violation of this provision by using Plan assets in order to obtain revenue sharing payments which were benefits for themselves as parties in interest.  Security Benefit and Nationwide also breached this provision by charging excessive fees to the Plan for the services they provided, including, by way of example, excessive M&E fees.

154.    ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2), provides an exemption from the prohibitions of ERISA § 406(a), 29 U.S.C. § 1106(a), for contracting or making reasonable arrangements with a party in interest for, *inter alia*, services necessary for the establishment or operation of the plan, *if no more than reasonable compensation is paid.*  Here, this exemption does not apply.  The value of the services that Security Benefit and Nationwide purportedly provided to the Investment Entities in exchange for the revenue sharing payments was nominal at best, and yet, the payments were substantial.  Similarly, Security Benefit and Nationwide charged excessive fees to the Plan that exceeded reasonable compensation for the services that they provided.  Accordingly, Security Benefit's and Nationwide's conduct in obtaining and retaining for their own use the revenue sharing payments, and charging excessive fees to the Plan constituted prohibited transactions under ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

155.    NEAMBC engaged in prohibited transactions pursuant to ERISA § 406(b)(1) & (b)(3), 29 U.S.C. § 1106(b)(1) & (b)(3).  As set forth above, ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), prohibits a fiduciary from receiving compensation from a party dealing with a plan in connection with a transaction involving the assets of the plan.

156.    Here, NEAMBC was compensated by Security Benefit and Nationwide, parties dealing with the Plan, for exclusively endorsing the Plan. The compensation was in connection with a transaction involving the assets of the Plan in that (1) the endorsement arrangement was itself a transaction involving the assets of the Plan; and (2) the amount of the compensation was based on Plan assets.

157.    NEAMBC used its authority, control and responsibility, which made it a fiduciary, to endorse the services provided by Security Benefit and Nationwide to Plan participants. NEAMBC had an interest in the transactions that affected exercise of its best judgment as a fiduciary. Accordingly, NEAMBC engaged in prohibited transactions under ERISA § 406(b)(1) & (b)(3), 29 U.S.C. § 1106(b)(1) & (b)(3).

158.    By engaging in prohibited transactions, Defendants breached their fiduciary duties under ERISA and caused the Plan to incur millions of dollars of losses. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, Plaintiffs, and the other Class members, lost millions of dollars of retirement savings.

159.    Pursuant to ERISA §§ 409(a), 502(a)(2) & (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate. Such relief includes: (a) relief for losses incurred by the Plan as a result of paying excessive fees to Security Benefit and Nationwide; (b) relief for losses incurred as a result of investing in funds that were selected by Security Benefit and Nationwide based on revenue sharing as opposed to a prudent evaluation of the merits of the funds; (c) disgorgement of excessive fees paid to Security Benefit and Nationwide; (d) disgorgement of revenue sharing payments retained by Security Benefit and Nationwide; (e) disgorgement of endorsement fees paid to NEAMBC by Security Benefit and Nationwide; and (f) such other relief that is just and proper under the circumstances.

### Count IV:

### (Liability Pursuant to ERISA Section 405(a))

160.   Plaintiffs incorporate herein the allegations set forth above.

161.   This Count is alleged against all Defendants.

162.   As alleged above, during the Class Period Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because of their discretionary authority and responsibility with respect to the management and administration of the Plan and authority and control over Plan assets.

163.   As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he or she knows of such a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. Defendants breached all three provisions.

164.   **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary unless he makes reasonable efforts under the circumstances to remedy the breach. Defendants knew of breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. Specifically, Defendants knew that Security Benefit and Nationwide paid NEAMBC to endorse the Plan; that the purpose of the endorsement was to help NEA, NEAMBC, Security Benefit and Nationwide promote and market the Plan for their own financial gain; and accordingly that NEA, NEAMBC, Security Benefit and Nationwide did not operate the Plan for the exclusive purpose of providing retirement benefits to Plan participants. Defendants also knew that none of them had provided complete and accurate information to Plan participants regarding NEAMBC's endorsement of the Plan and the financial incentives and support that Security Benefit and

1  Nationwide paid to NEAMBC with respect to the Plan.  Notwithstanding this knowledge,

2  Defendants did not undertake any effort to remedy any of the breaches alleged herein.

3  165.  **Knowing Participation in a Breach.**  ERISA § 405(a)(1), 29 U.S.C. §

4  1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another

5  fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes

6  to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.

7  NEA, NEAMBC, and the Individual NEAMBC Defendants knowingly participated in Security

8  Benefit's and Nationwide's breaches of fiduciary duty with respect to the endorsement payments

9  in that they knew of and benefited from the payments and sought, together with Security Benefit

10  and Nationwide, to conceal the financial incentives and support that Security Benefit and

11  Nationwide paid to NEAMBC.  Security Benefit and Nationwide knowingly participated in

12  NEA's, NEAMBC's, and the Individual NEAMBC Defendants' breaches of fiduciary duties

13  pertaining to NEAMBC's receipt of the endorsement payments and incomplete disclosures

14  pertaining thereto in that Security Benefit and Nationwide knew that the payments were made,

15  that NEA's and NEAMBC's support of the Plan was the result of the payments, and that the

16  disclosures made by NEA and NEAMBC failed to provide complete and accurate information

17  regarding the Plan.

18  166.  **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes

19  liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1),

20  in the administration of his specific responsibilities which give rise to his status as a fiduciary, he

21  has enabled another fiduciary to commit a breach.

22  167.  Defendants enabled one another's breaches of fiduciary duties because their

23  failure to provide complete and accurate information to Plan participants enabled one another to

24  commit the breaches of fiduciary duties alleged herein.  Had any of the Defendants faithfully

25  discharged their duties to prudently manage and administer the Plan and to provide complete and

26  accurate information to Plan participants regarding the relationship between NEA and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA
(Cause No. _____)          Page - 49

1  NEAMBC, on the one hand, and Security Benefit and Nationwide on the other hand, Plan
2  participants could have protected themselves from the losses incurred by the Plan.

3      168.   As a direct and proximate result of the breaches of fiduciary duties alleged herein,
4  the Plan, Plaintiffs, and the Class members lost millions of dollars of retirement savings.

5      169.   Pursuant to ERISA §§ 409(a), 502(a)(2) & (a)(3), 29 U.S.C. §§ 1109(a),
6  1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their
7  breaches of fiduciary duties alleged in this Count and to provide other equitable relief as
8  appropriate.

9  ### IX. CLASS ACTION ALLEGATIONS

10      170.   **Class Definition.**  Plaintiffs bring this action as a class action pursuant to Fed. R.
11  Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of
12  Plaintiffs and the following class of persons similarly situated (the "Class"):

13          Current or former NEA members who participated in the NEA
           Valuebuilder 403(b) program at any time between January 1, 1991 and the
14          present (and their heirs and/or beneficiaries).

15      171.   **Class Period.**  From January 1991, when the Plan was first offered through
16  Nationwide as the NEA endorsed 403(b) plan for NEA members through the present, where the
17  Plan is currently offered by Security Benefit and Nationwide.

18      172.   **Numerosity.**  The members of the Class are so numerous that joinder of all
19  members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at
20  this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are
21  more than 50,000 members of the Class.

22      173.   **Commonality.**  Common questions of law and fact exist as to all members of the
23  Class and predominate over any questions affecting solely individual members of the Class.
24  Among the questions of law and fact common to the Class are:

25
26

(a) Whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by f ailing to a ct prude ntly and solel y in the i nterests of the Plan 's participants and beneficiaries;

(b) Whether Defendants failed to provide complete and accurate information to Plan participants regarding NEAMBC's exclusive endorsement of the Plan in exchange for the payment of millions of dollars by Security Benefit and Nationwide and Security Benefit's and Nationwide's revenue sharing arrangements with Investment Entities;

(c) Whether Security Benefit and Nationwide charged excessive fees for the services that they provided to the Plan;

(d) Whether Defendants engaged in prohibited transactions under ERISA; and

(e) Whether the members of the Class suffered losses and, if so, the proper measure of such losses.

174. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class because: (a) the conduct of Defendants giving rise to the claims is identical as to all members of the Class; and (b) the losses suffered by the Plan, and, indirectly by Plan participants, are caused by Defendants Plan-wide breaches of fiduciary duties.

175. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in ERISA class action litigation and complex class action litigation generally. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

176. **Rule 23(b)(1)(B) Requirements.** Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

177.   **Other Rule 23(b) Requirements.** Class action status is also warranted under the other subsections of Fed. R. Civ. P. 23(b) because: (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.   An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets; to restore to the Plan all Plan assets and all profits Defendants made through use of Plan assets; and to restore to the Plan all profits which the Plan participants would have made had Defendants fulfilled their fiduciary obligations;

B.   Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duties, and in connection therewith: (1) an Order requiring NEAMBC to disgorge the endorsement fees that it received from Nationwide and Security Benefit and pay such fees to the Plan for allocation to the Plan participants' accounts; (2) an Order requiring Nationwide and Security Benefit to disgorge revenue sharing payments they received from Investment Entities and to pay such payments to the Plan; and (3) an Order requiring Nationwide and Security Benefit to disgorge excessive fees charged to Plan accounts with respect to their management and administration of the Plan;

C. An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

D. An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan;

E. An Order awarding actual damages in the amount of any losses to the Plan;

F. An Order awarding pre- and post-judgment interest based on the greater of: (1) Defendants' internal rates of return; (2) the Pension Benefit Guaranty Corporation's interest rates; or (3) statutory interest rates;

G. An Order awarding costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and other applicable laws or regulations;

H. An Order awarding attorneys' fees pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and the common fund doctrine;

I. An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants; and

J. Such other and further relief as to which this Court may deem just and proper.

DATED this 11th day of July, 2007.

KELLER ROHRBACK L.L.P.


By
Lynn Lincoln Sarko, WSBA #16569
Derek W. Loeser, WSBA #24274
Karin B. Swope, WSBA #24015
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

1
2
3
4

Jeffrey C. Engerman*
LAW OFFICES OF
  JEFFREY C. ENGERMAN, PC
12400 Wilshire Boulevard, Seventh Floor
Los Angeles, California 90025
Telephone: (310) 207-7777
Facsimile: (310) 207-7779

5
6
7
8
9

Allen C. Engerman*
LAW OFFICES OF
  ALLEN C. ENGERMAN, P.A.
Sanctuary Centre
4800 North Federal Highway, Suite 100-D
Boca Raton, Florida 33431
Telephone: (561) 392-2222
Facsimile: (561) 392-2123

10
11
12

Edward Siedle*
79 Island Drive South
Ocean Ridge, Florida 33435
Telephone: (561) 202-0919
Facsimile: (561) 202-0191

13

**Attorneys for Plaintiffs**

14
15

* Motion for *Pro Hac Vice* Admission to be
Filed

16
17
18
19
20
21
22
23
24
25
26